03-2459-pr
Wilson v. Mazzuca

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term, 2007

(Argued: April 8, 2008                                      Decided: June 24, 2009)

Docket No. 03-2459-pr

GEORGE WILSON,

  *Petitioner-Appellant,*

  v.

WILLIAM MAZZUCA,

  *Respondent-Appellee.*

Before: WALKER, CABRANES, and RAGGI, *Circuit Judges.*

Petitioner appeals from a judgment of the United States District Court for the Eastern District

of New York (David G. Trager, *Judge*), denying his petition for a writ of habeas corpus, filed pursuant

to 28 U.S.C. § 2254(d)(1). Petitioner contends that he is entitled to habeas relief because he was

deprived of the effective assistance of counsel at trial. Because the District Court conducted additional

fact-finding in order to adjudicate his claim, this appeal presents a question of first impression for our

Court: Is the standard of review prescribed by the Antiterrorism and Effective Death Penalty Act of

1996 ("AEDPA") for a claim resolved on the merits by a state court displaced when a federal district

court conducts additional fact finding? We hold that AEDPA's deferential standard of review is not

displaced and applies even when a district court conducts additional fact finding on habeas review.

Applying that standard of review to the state court's decision, we conclude that it was an unreasonable

application of clearly established federal law within the meaning of 28 U.S.C. § 2254(d)(1) for the state

1

court to conclude that petitioner received the effective assistance of counsel at his trial. Accordingly, we reverse the judgment of the District Court and remand the cause. On remand, the District Court shall issue a writ of habeas corpus to petitioner by the sixtieth calendar day after the issuance of our mandate unless the District Attorney of Queens County has, by that point, taken concrete and substantial steps expeditiously to retry petitioner.

Reversed and remanded.

> ERIK BIERBAUER (John A. Laufer, *on the brief*), Debevoise & Plimpton LLP, New York, NY, *for Petitioner-Appellant George Wilson.*
>
> MALANCHA CHANDA, Assistant Attorney General (Andrew M. Cuomo, Attorney General of the State of New York, *on the brief*, Barbara D. Underwood, Solicitor General, and Roseann B. MacKechnie, Deputy Solicitor General for Criminal Matters, *of counsel*), Office of the Attorney General of the State of New York, New York, NY, *for Respondent-Appellee William Mazzuca.*

JOSÉ A. CABRANES, *Circuit Judge*:

Petitioner-Appellant George Wilson appeals from a judgment of the United States District Court for the Eastern District of New York (David G. Trager, *Judge*), denying his petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254(d)(1). *See Wilson v. Mazzuca*, No. 01-CV-2246, 2007 U.S. Dist. LEXIS 22492, at *1 (E.D.N.Y. Mar. 28, 2007) ("*Wilson VII*"). Wilson contends that he is entitled to habeas relief because he was deprived of the effective assistance of counsel at trial in violation of the Sixth Amendment to the Constitution. *See Strickland v. Washington*, 466 U.S. 668 (1984). Because the District Court conducted additional fact finding in order to adjudicate that claim, this appeal presents a question of first impression for our Court: Is the standard of review prescribed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, for a claim resolved on the merits by a state court displaced when a district court conducts additional fact finding in habeas proceedings? We hold that AEDPA's deferential standard of review is

2

not displaced under these circumstances; it applies to Wilson's petition even though the District Court conducted additional fact finding. Applying that standard of review to the state court's decision, we conclude that, but for the substantial errors committed by trial counsel, there is a "reasonable probability" that Wilson would not have been convicted. The state court's decision to the contrary was an unreasonable application of clearly established federal law. Accordingly, we reverse the judgment of the District Court denying habeas relief and remand the cause. On remand, the District Court shall issue a writ of habeas corpus to Wilson by the sixtieth calendar day after the issuance of our mandate unless the District Attorney of Queens County has, by that point, taken concrete and substantial steps expeditiously to retry Wilson.[1]

## BACKGROUND

At approximately 2:00 p.m. on December 22, 1992, Roger Erra was robbed at gunpoint by two men who entered Erra's scrap metal business in Queens, New York. One of the robbers, whom Erra later identified as Wilson, assaulted him and demanded cash. *See* Trial Tr. 425-27, Sept. 20, 1995. After the robbery, Erra called the police and described the first robber as "a six-foot tall 'lighter' 'male black,' weighing approximately two hundred thirty pounds." *Wilson VII*, 2007 U.S. Dist. LEXIS 22492, at *3. At the police precinct on the day of the robbery, Erra reviewed several photo albums or "mug books" containing "mug shots" of people arrested for a variety of felonies, and identified Wilson's photograph in one of these albums. Police were unable to locate or speak with Wilson. On October 27, 1994, Wilson was arrested for an unrelated offense—alleged extortion at a construction site. The following day, Erra picked Wilson out of a line-up, and Wilson was charged with first and second-degree robbery.

---

[1] We note that Wilson has already served a prison sentence of nine-and-one-half years, and was discharged from parole as of March 28, 2008. These circumstances do not moot the present appeal because Wilson timely challenged his underlying conviction, and it cannot be "shown that there is no possibility that any collateral legal consequences will be imposed on the basis of the challenged conviction." *Sibron v. New York*, 392 U.S. 40, 57 (1968); *see also Fiswick v. United States*, 329 U.S. 211, 222 (1946) ("[Defendant] has a substantial stake in the judgment of conviction which survives the satisfaction of the sentence imposed on him. In no practical sense, therefore, can [defendant]'s case be said to be moot.").

*See id.* at *6-7.

## I.    State Trial Proceedings

Wilson was brought to trial before Justice Charles LaTorella in New York State Supreme Court, Queens County, in September 1995.  During his opening statement, Frank GaNun, who represented Wilson at trial, urged acquittal on the grounds of (1) mistaken identity and (2) insufficient police investigation.  In light of the second line of defense, the prosecution argued that, during his opening statement, GaNun had "open[ed] the door to [Erra's prior] photo identification[.]"  Trial Tr. 389:23-24, Sept. 20, 1995.[2]  The trial court was ambivalent, but warned GaNun that "[i]f you ask those questions on cross-examination, I think you will have opened up the door[.]"  *Id.* at 392:7-8.

The prosecution's first scheduled witness was Erra, but Erra did not appear, prompting the prosecutor to request a Material Witness Order.  At a hearing regarding that application, the trial judge asked the prosecution: "[Erra] is not only your complaining witness, but he's virtually your principal witness and except for peripheral facts, he's essentially your only witness; is that correct?"  Trial Tr. 329:18-22, Sept. 19, 1995.  The prosecution agreed that it was, and the trial court issued the order.

Pursuant to that order, Erra testified on September 21, 1995.  Under direct examination, Erra testified that he had chosen Wilson out of a line-up and made an in-court identification.  On cross-examination, GaNun inquired about the reliability of Erra's identification, the contours of the police investigation—including whether the police questioned other witnesses and had made diagrams of the crime scene—and Erra's absence from court.  *See Wilson VII*, 2007 U.S. Dist. LEXIS 22492, at *9-11.  GaNun also asked Erra whether he feared Wilson, and Erra testified that he did, and was specifically afraid of "[r]eprisals."  Trial Tr. 492:25, Sept. 21, 1995.  This was the first time the jury heard testimony from Erra that he feared that Wilson would retaliate against him for testifying.

---

[2] As explained below, New York does not permit evidence of a prior photograph identification unless a defendant "opens the door" to it.  *See post* at 18.

4

Following GaNun's cross-examination of Erra, the trial court concluded that, by attacking the reliability of the police investigation in his opening statement and cross-examination, GaNun had opened the door to Erra's initial identification of Wilson's photograph at the police precinct. On redirect examination, Erra confirmed his initial identification of Wilson, responding to the prosecutor's questions about "mug shot[s]." *See Wilson VII*, 2007 U.S. Dist. LEXIS 22492, at *11-12, *58. Although both terms conveyed to the jury that Wilson had been arrested previously, GaNun did not object. When the court inquired about the matter, GaNun stated, "Unfortunately, I probably didn't hear the word, 'mug[ ]shot.'" Trial Tr. 540:4-5, Sept. 21, 1995. The trial court then dealt with the question of how the "mug shot" itself would be shown to a jury. After initially observing that "there is no way that this jury is going to see the [booking plate] in front of the defendant's body," *id.* at 536:24-537:2, the trial court asked GaNun whether he wanted the plaque to be redacted from the photograph. GaNun responded, "I want the whole—I don't want any of the photograph going in. If it goes in, it's going to be in over the objection of the defense." *Id.* at 542:5-8. The trial court overruled GaNun's objection and again asked whether GaNun wanted the plaque to be redacted. GaNun responded, "I don't want it redacted." *Id.* at 542:12. The trial court then twice confirmed that GaNun waived redaction of the photograph.

Following Erra's testimony, the prosecution called a police officer and a detective who participated in the investigation. On cross-examination of the police officer, GaNun introduced an unredacted arrest report from Wilson's October 1994 arrest, which indicated that Wilson was arrested for "attempt[ed] grand larceny (extortion), menacing with pipes . . . [and] unlawfully enter[ing a] construction site." Pet'r App'x 61; *see also Wilson VII*, 2007 U.S. Dist. LEXIS 22492, at *52. The prosecution objected to its introduction as a business record, but the trial court overruled the objection, adding the following during a side-bar conference:

THE COURT: . . . I'm going to ask the defense, do you really want this in evidence?

5

MR. GaNUN: Absolutely.

THE COURT: All right. It's your choice. You're not asking for redaction or anything else?

MR. GaNUN: No, your Honor.

THE COURT: That's not a problem as long as we all fully understand what we're doing here, I'm sure you do, I'm not going to ask you what your theory of defense is. All I'm going to say to you is, I would not let the jury see this in ten million years unless you specifically wanted it. It's as simple as that. You realize, of course, that it contains a complaint of certain conduct. It's hearsay basically, but if you want it in, I'll put it in. Last chance now, do you want it?

MR. GaNUN: May I look at that one second?

. . .

THE COURT: Okay, what do you want to do?

MR. GaNUN: I want to have it put in evidence.

Trial Tr. 662:6-25; 664:16-17, Sept. 27, 1995. *See also Wilson VII*, 2007 U.S. Dist. LEXIS 22492, at *53 n.40.

Prior to the close of the prosecution's case, while GaNun was cross-examining the police detective, the trial court called for a recess and raised *sua sponte* and on the record the possibility that Wilson had received ineffective assistance of counsel. The court stated:

> I am becoming increasingly disturbed and I'm going to put it right on the record, at some of the decisions apparently made by defense in this case and I'm not going to probe defense's theories, I don't know what defense has in mind, but I'm going to tell you right here and now, certain questions are being raised in my mind.
>
> I understand that we have retained counsel. But so far, we have had an opening of the door on the investigation. We have had, although that I could see perhaps it was not anticipated but it happened, and it certainly should have been considered before the opening was made. That's number one.
>
> Number two, we had a questioning of the complaining witness as to why he didn't come in which he elicited the answers, as much as I tried to delay it or prevent it, that he was afraid to come in, which was disastrous for the defendant.
>
> Then we had the defense putting into evidence, the warrant and order and the . . . supporting affirmation by the D.A., which again did not help the defendant.

6

Then we had several questions today that are going right into areas that I personally, as a defense lawyer, wouldn't touch with a fifty foot pole.

I even found it necessary on my own motion, just a few minutes ago, to warn the jury not to draw too many conclusions from the mug book.

I have very serious problems with this case right now. The alarm bells are ringing in my head and I'm going right on the record. And the question concerns the representation of the defendant.

I'm sorry, there is no other way I can put it.

Trial Tr. 752:12-753:25, Sept. 27, 1995. After delivering these remarks, the trial court stated, "Under no circumstances would I ever interfere with representation, but there are certain 6th Amendment concerns that have arisen in my mind." *Id.* at 754:15-18. The court then asked GaNun whether he had "a strategy in this trial which encompasses the things that have been done so far?" *Id.* at 755:2-4. GaNun responded that he did, and the trial continued.

After the prosecution closed its case, GaNun called four witnesses for the defense, including an alibi witness[3] and a character witness. Carolyn Younger, the defense's character witness, testified about her knowledge of Wilson from his involvement in a community organization. GaNun asked Younger what kind of role Wilson played in the organization, and she responded, "George Wilson is a role model for young adults." Trial Tr. 930:8-13, Oct. 2, 1995. Upon hearing this testimony, the trial court *sua sponte* gave GaNun an opportunity to strike his own question, but he declined. *Id.* at 932-33. On cross-examination, the government inquired whether Younger was "aware that this defendant was convicted of Criminal Possession of a Controlled Substance" in 1986, *id.* at 941:15-17, or of a 1983 case involving criminal possession of a weapon, *see id.* at 959:4-8, or of a 1988 conviction for "snatch[ing] a gold chain and beat[ing] a woman about the face," *id.* at 950:8-10. (Younger had not been aware of these incidents.) GaNun objected to the prosecutor's questions about Wilson's criminal

---

[3] Defense witness Joseph Issac testified that he and Wilson were laying carpet on December 22, 1995—the day of the robbery—in Pennsylvania. *See* Trial Tr. 914-15, Oct. 2, 1995.

record, but the trial court overruled that objection, explaining that "I warned you that if you offered character evidence, it would permit the door to be opened. . . . You did this with your eyes open, you had put on a character witness, the door is open." *Id.* at 955:11-13, 955:22-23.

Both sides delivered their summations on October 3, 1995. Relying on evidence that would not have been admissible but for GaNun's decisions at trial, the prosecution argued that (1) Erra's testimony was reliable because, in addition to seeing Wilson at the crime scene and identifying him in a line-up and in court, Erra picked out Wilson's photograph from the police "mug book" soon after the robbery occurred, *see* Trial Tr. 1033, Oct. 3, 1995; (2) Erra feared retaliation from Wilson if he testified at trial, *see id.* at 1037; and (3) Younger's assessment of Wilson's character should be discounted in light of Wilson's prior convictions, s*ee id.* at 1048-49.

On October 4, 1995, Wilson was convicted of robbery in the second degree. He was subsequently sentenced to an indeterminate prison term of seven and one-half to fifteen years.

## II.     Post-Trial Proceedings in State Court

In October 1998, Wilson moved the trial court to set aside the judgment pursuant to New York Criminal Procedural Law § 440, on the ground that his trial counsel had been ineffective. The trial court denied the motion. On direct appeal to the Appellate Division of the New York Supreme Court, Second Department, Wilson pursued claims of ineffective assistance of counsel and insufficiency of the evidence. On May 30, 2000, the Appellate Division summarily rejected Wilson's claims and affirmed his conviction. *See People v. Wilson*, 709 N.Y.S.2d 415, 415 (2d Dep't 2000) ("*Wilson I*"). With respect to Wilson's ineffective assistance of counsel claim, the Appellate Division concluded, without explanation, that the claim was "without merit." *Id.* at 416. On November 27, 2000 the New York Court of Appeals denied Wilson's application for leave to appeal the Appellate Division's decision. *People v. Wilson*, 95 N.Y.2d 940, 940 (2000) ("*Wilson II*").

### III.    Habeas Corpus Proceedings in Federal Court

On April 9, 2001, Wilson filed a *pro se* petition for a writ of habeas corpus in the District Court. He contended, *inter alia*, that his trial counsel was ineffective for (1) eliciting testimony from Erra that he feared Wilson would retaliate against him for testifying; (2) opening the door—by attacking the police investigation of the robbery—to the admission of Erra's identification of Wilson's "mug shot" from a "mug book" on the day of the robbery; (3) not requesting the redaction of Wilson's "mug shot," which showed him with a booking plate hung around his neck, before the photograph was admitted into evidence; (4) moving into evidence an unrelated police report documenting Wilson's October 1994 arrest; and (5) opening the door to the admission of Wilson's prior convictions by eliciting testimony from Younger regarding Wilson's good character.

The District Court referred the petition to Magistrate Judge Robert M. Levy for a Report and Recommendation ("R&R"). On January 16, 2003, Magistrate Judge Levy submitted his R&R, which recommended denying habeas relief. *Wilson v. Mazzuca*, No. 01-CV-2246, 2003 U.S. Dist. LEXIS 27420, at *1 (E.D.N.Y. Jan. 16, 2003) ("*Wilson III*"). With respect to Wilson's ineffective assistance of counsel claim, Magistrate Judge Levy concluded that (1) GaNun's "tactical decisions that, in hindsight, might be considered ill-conceived" did not run afoul of the Sixth Amendment, and (2) Wilson "failed to demonstrate that he suffered prejudice as a result of counsel's actions." *Id.* at *31. In an Order filed May 30, 2003, Judge Trager, after an independent review of the record, adopted the R&R in its entirety and denied Wilson's habeas corpus petition. *Wilson v. Mazzuca*, No. 01-CV-2246, 2003 U.S. Dist. LEXIS 27421, at *1-2 (E.D.N.Y. May 30, 2003) ("*Wilson IV*").

Wilson appealed the District Court's judgment, and on January 5, 2005, another panel of this Court vacated the denial of the petition. *See Wilson v. Mazzuca*, 119 F. App'x 336, 338 (2d Cir. 2005) ("*Wilson V*"). That panel concluded that it was "unable to assess with confidence whether strategic considerations accounted for certain acts or omissions by defense counsel that had the effect of

9

substantially strengthening the state's otherwise weak case." *Id.* at 337 (internal quotation marks omitted). Accordingly, that panel vacated the judgment of the District Court and remanded "with instructions to give Wilson's trial counsel an opportunity to explain his performance." *Id.* at 338; *see also Sparman v. Edwards*, 154 F.3d 51, 52 (2d Cir. 1998) ("We believe that a district court facing the question of constitutional ineffectiveness of counsel should, except in highly unusual circumstances, offer the asserted ineffective attorney an opportunity to be heard and to present evidence, in the form of live testimony, affidavits, or briefs.").

On remand, the District Court referred the petition to Magistrate Judge Levy, who appointed *pro bono* counsel to represent Wilson. Judge Levy held a hearing on July 13, 2005, at which GaNun, Wilson's trial counsel, testified about his conduct at trial.[4] On June 30, 2006, the Magistrate Judge issued a Report and Recommendation (the "Second R&R"), this time recommending that habeas relief be granted. *Wilson v. Mazzuca*, No. 01-CV-2246, 2006 U.S. Dist. LEXIS 95883, at *1-2 (E.D.N.Y. June 30, 2006) ("*Wilson VI*"). Magistrate Judge Levy determined that GaNun "made serious errors that allowed the jury to learn of the otherwise inadmissible photo array ID and Wilson's criminal history . . . . [and that counsel's] acts were not the result of a deliberate and reasonably informed trial strategy." *Id.* at *46. These errors, according to the Second R&R, prejudiced Wilson by allowing the jury to learn that an eyewitness had "picked Wilson out of a photo array the day of the robbery, that [Wilson] had a criminal record, and that the chief prosecution witness was afraid of him." *Id.* at *49. When compared to the "serious weaknesses" of the prosecution's case, Magistrate Judge Levy concluded that "defense counsel's errors . . . 'undermine[d] confidence in the outcome'" of the trial, *id.* at *48 (quoting *Strickland*, 466 U.S. at 694), and he therefore recommended that the petition be granted.

---

[4] The testimony given at the July 13, 2005 hearing is described in the Discussion section below.

10

Judge Trager declined to adopt the Second R&R. *See Wilson VII*, 2007 U.S. Dist. LEXIS 22492, at \*1. Despite largely agreeing with Magistrate Judge Levy that GaNun's performance was objectively unreasonable,[5] Judge Trager ruled that Wilson suffered no prejudice. Specifically, the District Court concluded:

> [A]lthough (1) there was no physical evidence connecting defendant to the scene, (2) defendant made no inculpatory statement and (3) . . . Erra's identification was cross-racial, these factors, even taken together, would not have created a reasonable doubt given the evidence against petitioner. In light of Erra's strong identification that was based on a ten-minute opportunity to see the robbers and that was not undermined on cross-examination, there is not a reasonable probability that the outcome of the trial would have been different absent GaNun's errors. Ultimately, one cannot defeat something with nothing, especially when the nothing is a weak alibi with no supporting evidence.

*Id.* at \*66-67.

Pursuant to our disposition in *Wilson V*, jurisdiction was automatically restored by letter from Wilson's appellate counsel, Debevoise & Plimpton LLP, on April 23, 2007, and the Clerk of Court assigned this case to the present panel in the ordinary course. *See Wilson V*, 119 F. App'x at 338.

## DISCUSSION

This appeal presents, at the threshold, a question of first impression for our Court: Is AEDPA's standard of review for a claim resolved on the merits by a state court displaced when a district court conducts additional fact finding? For the reasons set forth below, we conclude that AEDPA's standard of review remains in force. With respect to the habeas corpus petition itself, we conclude that it should be granted. It was an unreasonable application of clearly established federal law for the state court to conclude that Wilson received his Sixth Amendment right to counsel, or that the outcome reached by the jury in this case is reliable.

---

[5] Judge Trager did not agree, however, that defense counsel's eliciting of the eyewitness's fears of reprisals was unreasonable. *See Wilson VII*, 2007 U.S. Dist. LEXIS 22492, at \*61 (finding that counsel's questions that revealed Erra's fears were part of a trial strategy to show (a) that the fears were unfounded, and (b) that the witness was "a puppet of the police"). Nevertheless, the other errors were, in Judge Trager's view, sufficient to constitute an objectively unreasonable performance. *See id.* at \*62.

**I.     AEDPA's Standard of Review Governs Wilson's Ineffective Assistance of Counsel Claim Even Though the District Court Found Additional Facts in Habeas Proceedings.**

"We review [a] district court's decision to grant or deny habeas relief *de novo*." *Dolphy v. Mantello*, 552 F.3d 236, 238 (2d Cir. 2009). "When [a] state court has adjudicated the merits of petitioner's claim, we apply the deferential standard of review established by [AEDPA], under which we may grant a writ of habeas corpus only if the state court's adjudication 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" *Id.* (quoting 28 U.S.C. § 2254(d)(1)).[6] Where, as here, "a state court fails to articulate the rationale underlying its rejection of a petitioner's claim, and when that rejection is on the merits, the federal court will focus its review on whether the state court's ultimate decision was an unreasonable application of clearly established Supreme Court precedent." *Eze v. Senkowski*, 321 F.3d 110, 125 (2d Cir. 2003) (internal quotation marks omitted).

The District Court was uncertain about whether AEDPA's deferential standard governed its review of Wilson's ineffective assistance of counsel claim, noting "[i]t is . . . unclear whether deference is still appropriate under AEDPA once a federal court has conducted an evidentiary hearing and elicited new evidence that was not before the state court. The Second Circuit has not answered this question." *Wilson VII*, 2007 U.S. Dist. LEXIS 22492, at *30. The District Court decided that the standard of review depended on which prong of *Strickland* was at issue. Under *Strickland*, a defendant must demonstrate both that (1) his attorney's performance "fell below an objective standard of

---

[6]  28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

12

reasonableness," 466 U.S. at 688, and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. With respect to the first prong—the performance of counsel—the District Court determined that "the evidence elicited at the July 13, 2005 hearing is relevant solely in deciding whether . . . GaNun had strategic reasons for his decisions at trial . . . [and, therefore,] in analyzing *Strickland*'s first prong, a *de novo* standard of review is appropriate." *Wilson VII*, 2007 U.S. Dist. LEXIS 22492, at *33. With respect to the second prong—the prejudice prong—however, the Court concluded that the evidence from the July 13, 2005 hearing "[was] irrelevant in deciding whether GaNun's actions prejudiced defendant." *Id.* Accordingly, the District Court applied AEDPA deference only to *Strickland*'s prejudice prong. *See id.* at *34.

On appeal, Wilson argues that the District Court should have reviewed the entirety of his ineffective assistance claim *de novo*. Specifically, Wilson contends that "[i]t is impossible to ascertain how the New York state court would have decided [his] claim for post-conviction relief if it had the benefit of the testimony elicited years later at the hearing before Magistrate Judge Levy." Pet'r Br. 36. Respondent counters that the plain meaning of AEDPA's statutory language makes clear that AEDPA deference governs the claim in its entirety. We agree with respondent.

The standard of review set forth in AEDPA is not conditional. It is stated in mandatory terms—habeas relief "*shall not* be granted with respect to *any claim* that was adjudicated on the merits in State court proceedings . . . ," 28 U.S.C. § 2254(d) (emphases added)—and these terms do not lose their force because an intervening evidentiary hearing is held in federal court. Indeed, the provision of AEDPA setting forth the circumstances under which a federal evidentiary hearing can be held, 28 U.S.C. § 2254(e), does not suggest that holding such a hearing has any impact whatsoever on the

13

standard of review governing habeas claims.[7]  Accordingly, a habeas claim, even if subject to a federal evidentiary hearing, is still a "claim that was adjudicated on the merits in State court proceedings," 28 U.S.C. § 2254(d), and is subject to the highly deferential standard of review established therein, *id*.

Where, as here, the habeas claim is brought under 28 U.S.C. § 2254(d)(1), a habeas court asks whether there was "an unreasonable application of clearly established Federal law," in light of all the facts and circumstances—including whatever facts are discovered during a post-conviction hearing in federal court subject to the requirements of 28 U.S.C. § 2254(e)(1) ("[A] determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").  Any new evidence uncovered in the federal proceeding is relevant only insofar as it assists the habeas court in determining whether the state court reached an unreasonable application of law.[8]

---

[7]  28 U.S.C. § 2254(e) provides:

> (1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.
>
> (2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that–
>
> > (A) the claim relies on–
> >
> > > (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> > >
> > > (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
> >
> > (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

[8] As the Supreme Court has ruled, where a state court fails to adjudicate a claim on the merits, and no procedural impediment prevents a federal court from doing so, *de novo* review may be appropriate.  *See Cone v. Bell*, 129 S. Ct. 1769, 1784 (2009); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005).  It is in that sense that this court has observed that a state court's unjustified failure to permit adequate development of a factual record may warrant *de novo* review.  *See Drake v. Portuondo*, 553 F.3d 230, 239, 247 (2d Cir. 2009).  This case does not fall within this narrow sphere; nothing in the record indicates that the state courts unreasonably refused to permit Wilson to develop the main facts supporting his claim.  *See id*.

14

In reaching this conclusion, we join two of our sister circuits that have considered this question.[9] In *Pecoraro v. Walls*, the Seventh Circuit held:

> [AEDPA] authorizes us to upset . . . a [state court] conviction only if the state courts' adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). . . . [T]his standard is applicable even though the district judge held an evidentiary hearing. The evidence obtained in such a hearing is quite likely to bear on the reasonableness of the state courts' adjudication; that is true; but we do not see why it should alter the *standard* of federal review.

286 F.3d 439, 443 (7th Cir. 2002). The Fifth Circuit reached a similar conclusion in *Valdez v. Cockrell*, explaining:

> Where a district court elects, in instances not barred by § 2254(e)(2), to hold an evidentiary hearing, the hearing may assist the district court in ascertaining whether the state court reached an unreasonable determination under either § 2254(d)(1) or (d)(2). An evidentiary hearing is not an exercise in futility just because §§ 2254(d) and (e)(1) require deference.

274 F.3d 941, 952 (5th Cir. 2001).[10]

With respect to Wilson's argument that "[i]t is impossible to ascertain how the New York state court would have decided [his] claim" if it had had the benefit of the testimony elicited years later at the hearing before Magistrate Judge Levy, Pet'r Br. 36, we acknowledge that this may be so, but that is not the relevant inquiry under AEDPA. In the instant case, our review is limited by statute to whether the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

---

[9] The Eleventh Circuit acknowledged in *LeCroy v. Secretary, Florida Department of Corrections* that it had not yet reached the question of what standard of review to employ after a district court has conducted additional fact finding, but it did discuss in a footnote the arguments for and against applying AEDPA deference in such a case. *See LeCroy*, 421 F.3d 1237, 1263 n.30 (11th Cir. 2005).

[10] Insofar as the Fifth Circuit's decision suggests that additional fact finding might bear on the determination of whether a state adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" under 28 U.S.C. § 2254(d)(2), we do not adopt the view of the Fifth Circuit. Absent a determination that the state court unreasonably failed to permit a petitioner from developing the main facts necessary to support his claim, *see Drake*, 553 F.3d at 247, new facts found in federal habeas proceedings have no bearing whatsoever on whether a state court's findings of fact constituted an "unreasonable determination" based on "the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).

Where, as here, a district court has performed additional fact finding, the court must then ask whether the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law," *id.*, in light of any newly-discovered facts. It is clear that federal courts are not being directed to construct and answer an impossible subjunctive—what would the state court have decided had additional information been available? Instead, we are directed to apply the same AEDPA standard that would otherwise be in force, now in light of the new information that has been obtained through a § 2254(e) hearing.

Accordingly, AEDPA's deferential standard of review governs Wilson's claim in its entirety.

II. **The State Court's Denial of Wilson's Claim of Ineffective Assistance of Counsel Was an Unreasonable Application of Federal Law.**

To succeed on a claim of ineffective assistance of counsel in violation of the Sixth Amendment, as noted above, a defendant must demonstrate (1) that his attorney's performance "fell below an objective standard of reasonableness," *Strickland*, 466 U.S. at 688, and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. To satisfy the first prong—the performance prong—the record must demonstrate that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Such errors include "omissions [that] cannot be explained convincingly as resulting from a sound trial strategy, but instead arose from oversight, carelessness, ineptitude, or laziness." *Eze*, 321 F.3d at 112. Under the second prong—the prejudice prong—a "reasonable probability" of a different result is a "probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The prejudice prong can be satisfied "even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id.*

16

**A.** **Trial Counsel's Performance Was Objectively Unreasonable, and It Was an Unreasonable Application of Federal Law for the State Court To Conclude Otherwise.**

Wilson's petition notes five alleged errors that he maintains are objectively unreasonable. Magistrate Judge Levy agreed entirely with Wilson's position, whereas Judge Trager concluded that only four out of the five purported errors were objectively unreasonable. However, both the Magistrate Judge and the District Judge determined that the performance of GaNun, Wilson's counsel at trial, was objectively unreasonable. Our reading of the record supports this conclusion.

As noted above, Wilson argues that GaNun committed five "devastating errors" that allowed prejudicial information to cloud the jury's fact-finding. Pet'r Br. 4-5. Listed chronologically, they are: (1) eliciting testimony from Erra, the complainant and eyewitness, that he feared Wilson would retaliate against him for testifying; (2) opening the door—by attacking the police investigation of the robbery—to the admission of the Erra's identification of Wilson's "mug shot" from a "mug book" on the day of the robbery; (3) not objecting to the prosecutor's characterization of Wilson's photograph as a "mug shot" and not requesting the redaction of Wilson's "mug shot," which showed him with a booking plate hung around his neck; (4) moving into evidence an unredacted police report describing Wilson's October 1994 arrest for an armed "shake-down" at a construction site; and (5) opening the door to the admission of Wilson's prior convictions for drug dealing and physical harassment by eliciting testimony from Younger regarding Wilson's good character.

First, GaNun elicited testimony from Erra—the only eyewitness to testify at trial—that he feared reprisals from Wilson. Remarkably, after confirming that Erra had not been threatened "in any manner" or "in any way," and after stating that his examination was complete, GaNun asked Erra, "[w]ere you in fear of this defendant, George Wilson?" Erra responded, "Yes." GaNun then asked: "And why were you in fear of this defendant, George Wilson?" Erra answered: "Reprisals." Trial Tr. 492:21-25, Sept. 21, 1995.

17

At the July 13, 2005 hearing before Magistrate Judge Levy, GaNun justified his cross-examination on the ground that he had wanted to show that Erra was "a puppet of the police" and thought it was possible that Erra would testify that he did not fear reprisals from Wilson. *Wilson VII*, 2007 U.S. Dist. LEXIS 22492, at *61. Judge Trager observed that this "possibility seemed unlikely given [the eyewitness's] earlier testimony" on cross-examination, *id.*, in which he had expressed "fear for my family, . . . [and] fear for myself," *id.* at *60. Nevertheless, Judge Trager concluded that GaNun's questioning was "not so far-fetched, given the vagueness of Erra's earlier testimony, to be completely unreasonable." *Id.* at *61. We disagree. It was objectively unreasonable for GaNun to ask Erra whether he feared Wilson and even more unreasonable, after Erra replied in the affirmative, to ask the open-ended question "why?" Before GaNun elicited this testimony, the jury had not heard any suggestion that fear of Wilson accounted for Erra's failure to appear. To ask these questions on the theory that Erra might say that he was not afraid of Wilson was reckless and objectively unreasonable.[11]

Second, by attacking the police investigation, GaNun opened the door to the admission of the eyewitness identification from a photograph array on the day of the robbery. Under New York law, evidence that an eyewitness identified Wilson from a photograph album on the day of the robbery was inadmissible in the prosecution's case-in-chief, but could be used as rebuttal evidence if defense counsel challenged the adequacy of the investigation. *Wilson VII*, 2007 U.S. Dist. LEXIS 22492, at *48; *see also People v. Lindsay*, 42 N.Y.2d 9, 12 (1977) ("It is settled [under the law of New York] . . . that a witness may not testify regarding a photographic identification of the defendant . . . ."); *People v. Hamilton*, 826 N.Y.S.2d 294, 294 (2d Dep't 2006) ("While a witness is generally not permitted to testify to an extrajudicial identification of a photograph of the defendant, such testimony is appropriate when the defendant opens the door to this type of inquiry during cross-examination of the witness." (internal

---

[11] Judge Trager also concluded that GaNun's questions about Erra's early absence from the trial could have been part of a reasonable trial strategy to show that Erra's fears of reprisal were unfounded. *Wilson VII*, 2007 U.S. Dist. LEXIS 22492, at *61. We do not agree with this assessment of the evidence. Erra's fear of reprisal only came out under cross-examination by GaNun, who did not attempt to show that the fears were unfounded.

18

citations omitted)); *People v. Hines*, 491 N.Y.S.2d 764, 765 (2d Dep't 1985) (explaining that the purpose of the rule is to avoid "improper bolstering.").

GaNun was warned by the state trial judge, after he made an opening statement attacking the investigation, of the consequences should he press this argument on cross-examination. *See* Trial Tr. 392:7-12, Sept. 20, 1995. Nevertheless, on his cross-examination of Erra, GaNun inquired into the adequacy of the investigation, asking, for example, whether diagrams were made, and photographs were taken, of the crime scene. *See Wilson VII*, 2007 U.S. Dist. LEXIS 22492, at *49; Trial Tr. 460:24 - 461:7, Sept. 21, 1995. GaNun also asked Erra if he knew whether the police had spoken to other possible witnesses. Trial Tr. 487:23-488:16, Sept. 21, 1995. At a sidebar held to determine whether the prosecution would be permitted to introduce evidence of the photographic identification to rebut GaNun's attacks on the adequacy of the investigation, GaNun appeared to misunderstand the legal issue. In opposing the prosecution's motion to admit the identification, GaNun argued:

> [T]he door wasn't open, number one . . . because the statement 'poor investigation' doesn't relate to anything about photographic identification. Secondly, your Honor, in regard to the cross-examination of Mr. Erra, at no time did I go near the issue of photographic identification.

*Id.* at 508:21-509:4. The trial court responded: "This door has been opened so wide, I've never seen a wider open door." *Id.* at 516:18-19. Not surprisingly, the court ruled in favor of admitting the photograph-array identification.

At the hearing before Magistrate Judge Levy, GaNun testified that he thought only questions specifically about the photograph-array identification would open the door to the admission of that identification. Hr'g Tr. 60:11-22, July 13, 2005. This mistaken belief was entirely unreasonable. Before Erra ever took the stand, the trial court warned GaNun that questioning the adequacy of the investigation would trigger the admission of the identification evidence. This warning was more than sufficient to dispel any misunderstanding on GaNun's part regarding the consequences of challenging the adequacy of the investigation.

19

Third, after the state trial court determined that the photograph-array identification was admissible, the prosecutor referred multiple times to the photographs of Wilson as "mug shots," without objection from GaNun, before moving the photographs into evidence. *Wilson VII*, 2007 U.S. Dist. LEXIS 22492, at *57-58. At that time, the court remarked, "there is no way that this jury is going to see the [booking plate] in front of the defendant's body showing a number NYCPD; that's out, that's going to be redacted." Trial Tr. 536:24-537:3, Sept. 21, 1995. GaNun objected to the photographs on the ground that the jury would infer that the photographs were "mug shots." The trial court reminded GaNun that the prosecution had already referred to the photographs as "mug shots" without objection. GaNun responded that he must not have heard those words. The court then offered defense counsel a chance to redact the photographs, but GaNun *declined* the offer, and the photographs were admitted in unredacted form.

At the hearing before Magistrate Judge Levy, GaNun offered no strategic explanation for (1) his failure to object to the characterization of the photograph of Wilson as a "mug shot," suggesting Wilson's criminality, or (2) his decision not to redact the portion of the photographs showing Wilson's booking plate. GaNun stated only that he wanted to "get on with the case in chief." Hr'g Tr. 67:6, July 13, 2005. GaNun's refusal of the trial court's offer to redact the photographs, so as to mitigate, even if only slightly, their prejudicial effect, is incomprehensible. As Judge Trager stated, "the fact that the [trial] court offered to redact the photo makes it difficult to understand GaNun's behavior. It appears from the trial record that GaNun, who had just had his objections overruled, was simply being obstinate with the court." *Wilson VII*, 2007 U.S. Dist. LEXIS 22492, at *59. We agree with Judge Trager's assessment; defense counsel's decisions regarding the "mug shots" were unreasonable.

Fourth, GaNun introduced evidence of Wilson's prior arrest on unrelated charges. Specifically, GaNun introduced at trial a non-redacted copy of a police report arising from Wilson's arrest in 1994. The trial court's astonishment is manifest from the record:

20

THE COURT: . . . I'm going to ask the defense, do you really want this in evidence?

MR. GaNUN: Absolutely.

THE COURT: All right. It's your choice. You're not asking for redaction or anything else?

MR. GaNUN: No, your Honor.

THE COURT: That's not a problem as long as we all fully understand what we're doing here, I'm sure you do, I'm not going to ask you what your theory of defense is. All I'm going to say to you is, I would not let the jury see this in ten million years unless you specifically wanted it. It's as simple as that. You realize, of course, that it contains a complaint of certain conduct. It's hearsay basically, but if you want it in, I'll put it in.

Trial Tr. 662:6-25; 664:16-17, Sept. 27, 1995. At the June 13, 2005 hearing before Magistrate Judge Levy, GaNun stated that he wanted the entire, unredacted arrest report entered into evidence because he had wanted to show that the 1994 arrest was "baloney" and that he was being "honest" with the jury. *Wilson VII*, 2007 U.S. Dist. LEXIS 22492, at *54. These purported reasons are, as Judge Trager stated, "incomprehensible." *Id.* at *55. Furthermore, it is apparent from GaNun's testimony that he did not even realize that the report contained prejudicial information, even though it linked Wilson to "allegations of prior threatening and violent activity." *Id.* at *57. We agree with Judge Trager that it was objectively unreasonable for defense counsel not to redact the prejudicial information contained in the police reports.

Fifth and finally, GaNun opened the door to the admission of Wilson's criminal history by calling a witness to testify about Wilson's reputation in the community. *Wilson VII*, 2007 U.S. Dist. LEXIS 22492, at *38. The trial court warned GaNun *sua sponte* that if he elicited character testimony, the prosecution would be able to introduce Wilson's criminal record as rebuttal evidence. The record indicates that, despite these warnings, GaNun apparently failed to understand that by eliciting this testimony, he would open the door to Wilson's criminal history. Indeed, at the July 13, 2005 hearing before Magistrate Judge Levy on defense counsel's effectiveness and strategy, Wilson's appointed counsel specifically said to GaNun, "[w]hat I'm asking is whether you called [the witness] with a trial

21

strategy in mind of opening the door to Mr. Wilson's prior criminal record?" and GaNun responded, "[n]o, I would say that I had no intention of doing that. If it happened, it happened." Hr'g Tr. 106:8-12, July 13, 2005. In light of GaNun's testimony, Judge Trager concluded that "[e]ven if it is assumed that GaNun's actions and decisions concerning Younger's testimony were conscious and not the result of errors and unreasonable misunderstandings of the trial court's rulings . . . it is unlikely that GaNun properly weighed the risks of his 'strategy.'" *Wilson VII*, 2007 U.S. Dist. LEXIS 22492, at *47. We fully agree. As a result of GaNun's actions, the jury heard testimony that Wilson had been previously convicted of drug possession and had pleaded guilty to punching a woman and taking her necklace. It was objectively unreasonable for defense counsel, particularly in the face of the trial court's warnings, not to have understood that eliciting reputation testimony would lead to the introduction of Wilson's criminal history.

In sum, none of the five errors identified by Wilson are justified by any strategy that GaNun set forth at trial or at the July 13, 2005 hearing before Magistrate Judge Levy. The record indicates that defense counsel misinterpreted and misunderstood the law, failed to pay attention, acted recklessly, and did not appreciate the consequences of his decisions, even though in many cases he was explicitly warned of the risks by the trial court. Indeed, the trial court cited several of these errors and stated on the record, after sending the jury out of the room: "I have very serious problems with this case right now. The alarm bells are ringing in my head and I'm going right on the record. And the question concerns representation of the defendant. I'm sorry, there is no other way I can put it." Trial Tr. 753:19-25, Sept. 27, 1995. The trial court resolved its concerns by simply asking GaNun whether he had a strategy—any strategy—in mind as he was pursuing his case. GaNun answered affirmatively, and the trial court stated "[t]hat's sufficient for me." *Id.* at 755:6. In light of our review of the full record—including GaNun's testimony at the July 13, 2005 hearing regarding his actual "strategy"—it is

22

plain that defense counsel's performance was objectively unreasonable. To conclude otherwise would be an unreasonable application of clearly established federal law.

**B.** **There Is a Reasonable Probability that, But for Trial Counsel's Unprofessional Errors, the Jury Would Not Have Convicted Wilson.**

After concluding that GaNun's performance was objectively unreasonable, the District Court determined that habeas relief was nevertheless unwarranted because it was not an unreasonable application of *Strickland* for the state court to conclude that defense counsel's errors did not prejudice Wilson. The District Court explained:

> Even if GaNun had not committed any of the errors outlined above, there is not a "reasonable probability that, but for counsel's unprofessional errors, the result at trial would have been different." Stated differently, even if defense counsel had presented a mistake-free defense, it is not reasonably probable that petitioner would not have been found guilty. Although the Second Circuit characterized the State's case as "weak," the evidence against petitioner was, in fact, strong. Critically, Erra was able to view the perpetrators at close range for almost ten minutes under bright lighting.

*Wilson VII*, 2007 U.S. Dist. LEXIS 22492, at *63. The District Court concluded that even if GaNun had not made any of the errors outlined above, "there is not a reasonable probability that the outcome of the trial would have been different[.]" *Id.* at *66.

We disagree with the District Court's conclusion. In our view, defense counsel's errors—taken together and viewed in light of all the evidence—"undermine [our] confidence in the outcome" of the trial. *Strickland*, 466 U.S. at 694. As the trial court confirmed at the beginning of the trial, the prosecution's case was based *entirely* on a single eyewitness identification made *two years* after the robbery by a reluctant eyewitness who testified only after being served with a material witness warrant. *See* Trial Tr. 329:18-22, Sept. 19, 1995. There was no physical evidence that linked Wilson to the crime—no fingerprints, no surveillance footage—and Wilson made no inculpatory statements. In light of these facts, we agree with the assessments of Magistrate Judge Levy and the earlier panel of this Court that the prosecution's case against Wilson was "weak." *Wilson V*, 119 F. App'x at 337. As Magistrate Judge Levy observed:

23

To prove its case, the prosecution needed to convince the jury that Erra had accurately identified Wilson. Without GaNun's errors, the jury would have learned that Wilson became a suspect in the 1992 robbery, but that the only identification was made at a lineup two years later. Finally, the jury would not have known of Wilson's prior convictions.

*Wilson VI*, 2006 U.S. Dist. LEXIS 95883, at *49 (footnote omitted).

On the other side of the ledger, because of GaNun's errors, the jury learned, *inter alia*, that (1) Erra, the eyewitness, feared that Wilson would retaliate against him for testifying—testimony that the trial court characterized as "disastrous for the defendant," Trial Tr. 753:6-7, Sept. 27, 1995; (2) Erra had, in fact, identified Wilson's photograph on the day of the robbery, in addition to a lineup two years later; (3) Wilson had a "mug shot;" (4) Wilson had been arrested in October 1994 for an alleged "shake-down" operation at a construction site; (5) Wilson had been convicted of drug possession; and (6) Wilson had pleaded guilty to punching a woman and taking her necklace. This evidence was unduly prejudicial to the defense because it immeasurably undermined Wilson's mistaken identification defense, corroborated the eyewitness identification, and implied that Wilson had a propensity for criminality and violence. Accordingly, our confidence in the jury's verdict is critically undermined. Indeed, our impression is confirmed by the trial court's highly unusual statements—made *sua sponte* during the prosecution's case—that there were real-time, not merely *post hoc*, concerns that Wilson did not receive the minimum guarantee of counsel provided by the Sixth Amendment. *See, e.g., id.* at 754:9-755:6. The trial court's acceptance of GaNun's conclusory representation that he had a defense strategy, while understandable in the heat of trial, was not borne out by his testimony at the hearing before Magistrate Judge Levy. Therefore, we are unpersuaded that GaNun had any reasonable trial strategy, or that his actions and omissions did not unfairly prejudice his client.

In light of the weakness of the prosecution's case and the extent to which defense counsel's errors bolstered the case against Wilson, it is "reasonabl[y] probab[le] that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at

24

694. As the Supreme Court explained in *United States v. Dominguez Benitez*, "[t]he reasonable-probability standard is not the same as, and should not be confused with, a requirement that a defendant prove by a preponderance of the evidence that but for error things would have been different." 542 U.S. 74, 83 n.9 (2004) (citing *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)). A reviewing court looks instead to whether "the probability of a different result is 'sufficient to undermine confidence in the outcome' of the proceeding." *Dominguez Benitez*, 542 U.S. at 83 (quoting *Strickland*, 466 U.S. at 694). Such is the case here, and it was an unreasonable application of *Strickland* for the state courts to conclude otherwise.

## CONCLUSION

To summarize: We hold that AEDPA's standard of review applies to a 28 U.S.C. § 2254(d)(1) claim resolved on the merits by a state court even when a district court conducts additional fact finding. Applying this standard to the instant case, we hold that it was an unreasonable application of *Strickland* for the Appellate Division to deny Wilson's claim of ineffective assistance of counsel. Accordingly, we

(1) reverse the judgment of the District Court, and

(2) remand the cause.

On remand, the District Court shall issue a writ of habeas corpus to Wilson by the sixtieth calendar day after the issuance of our mandate unless the District Attorney of Queens County has, by that point, taken concrete and substantial steps expeditiously to retry Wilson.

The mandate shall issue forthwith. If further proceedings arising from Wilson's habeas petition are required in this Court, the parties shall inform the Clerk of this Court by letter. Jurisdiction will then be automatically restored to this Court without need for a new notice of appeal. *See United States v. Jacobson*, 15 F.3d 19, 21-22 (2d Cir. 1994). After jurisdiction is restored, the Clerk shall set an expedited briefing schedule, and the matter will then be considered by this panel on letter briefs.